**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**AARON EDEN, VICTORIA EDEN, AND
ELISHA EDEN AND ADRIENNE EDEN,
MINORSBY AND THROUGH THEIR
NATURAL GUARDIANS, AARON EDEN
AND VICTORIA EDEN**                                                        **PLAINTIFFS**

**V.**                                                   **CIVIL ACTION NO. 1:18cv54LG-RHW**

**HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT,
LLC, HUNT MH PROPERTY MANAGEMENT
LLC, UNKNOWN JOHN AND JANE DOES A
THROUGH M, AND OTHER UNKNOWN
CORPORATE ENTITIES N THROUGH Z**                              **DEFENDANTS**

**DEFENDANTS' MEMORANDUM BRIEF IN SUPPORT OF
MOTION TO EXCLUDE EXPERT OPINIONS OF DR. PAUL GOLDSTEIN**

Hunt Southern Group, LLC, Hunt MH Property Management, LLC, and Forest City

Residential Management, LLC ("Defendants") move under Federal Rules of Evidence 402, 702,

and 703 to exclude the opinions of Plaintiffs' designated expert witness, Dr. Paul Goldstein.

**INTRODUCTION AND BRIEF OVERVIEW OF THE FACTS**

Plaintiffs allege that they were exposed to mold while living at Keesler Air Force Base

and that this exposure caused physical injuries. No medical doctor has ever told them that any

medical symptoms they experienced were caused by mold. No medical doctor will testify or can

testify that any of their symptoms were caused by mold. In fact, the only medical doctor who has

examined Plaintiffs and who will offer opinions in this case is Dr. Wilhelm, board certified in

Allergy and Immunology, Pulmonary Medicine and Internal Medicine. Authorized by this Court

under Rule 35 to examine Plaintiffs, Dr. Wilhelm has opined "I do not believe to a reasonable

degree of medical certainty that [Plaintiffs' ] symptoms were caused by mold exposure in [their]

home." Ex. 1. Because no medical doctor has linked or could link their symptoms to mold, Plaintiffs sought an "expert" witness who would. They found Dr. Paul Goldstein.

Dr. Paul Goldstein is Plaintiffs' sole expert on general and specific causation. As it turns out, Dr. Goldstein refuses to opine that any Plaintiff's symptom was caused by mold, and renders unreliable opinions on causation in general. For many reasons, these opinions should be excluded.

Dr. Goldstein is not a medical doctor but a self-taught toxicologist.[1] His causation opinions have been excluded no less than three times—in circumstances eerily similar to this case (discussed hereafter). In his report in this case and all the cases like it, Dr. Goldstein followed a cookie-cutter format which listed, first, a number of symptoms of which any Plaintiff in the household had been diagnosed; a statement that "some, if not all" of the symptoms were "positively correlated" with molds; a listing of the genus (not species) of molds found in a single air sample from Plaintiffs' home; and then a conclusory statement that Plaintiffs were "exposed to, and suffered from, toxins released by the presence" of certain molds. Dr. Goldstein's methodology included the review of a list of symptoms from Plaintiffs' pre-discovery disclosures prepared by their lawyers; an alleged examination of the family's medical records to determine whether anyone in the family experienced that symptom; a review of any air sample taken in the family home (if applicable), and then a conclusion that each of the symptoms identified was "positively correlated" with and "suffered from" exposure to mold. Ex. 3 (Goldstein Dep. (v. 2) at 300:7–18). That is all he did. Indeed, Dr. Goldstein summarized the extent of his opinions as follows:

---

[1] Dr. Goldstein does not have a Ph.D. in toxicology and has never taken a college course in toxicology, but claims he is qualified based on "self-educat[ion]" in toxicology and "training from the Society of Toxicology by sitting in on courses that they offer at meetings." Ex. 2 (Goldstein Dep. (v. 1) at 13:14–14:5; *id.* at 16:20–22; *id.* at 17:1–16; *id.* at 17:22; *id.* at 17:6–8.

Q     In all of the nine cases, the most you can say is that some of these symptoms can be caused by some exposure to some molds, and that some people in those households had some of those symptoms; true?

A     I would say that's pretty close.

Ex. 3 at 331:23–332:2; *id.* at 330:3–10. Dr. Goldstein did not do, and is not qualified to do, a differential diagnosis. Dr. Goldstein admits he did nothing to "rule out" other potential causes of the Plaintiffs' symptoms—whether from pre-existing allergies, environmental factors, or other disease agents. While Dr. Goldstein paid appropriate lip service to the treating physicians ("always going to go with what the physician says," Ex. 2 at 211:1–2), Dr. Goldstein rejected each and every occasion when a Plaintiff's own treating physician failed to link the symptom to mold or when that treating physician attributed the cause of that symptom to something other than mold.

As explained in more detail below, Dr. Goldstein's general causation opinion has serious problems and should be excluded. But more importantly, even were this opinion admissible, it would do nothing to establish specific causation. For this reason and the additional reasons discussed below, this Court should exclude Dr. Goldstein's opinions on specific and general causation as unreliable under Rule 702 and *Daubert*.

## LEGAL STANDARD

The Court is familiar with the *Daubert* legal standard. In *Williams v. Manitowoc Cranes, LLC*, this Court described in detail the Fifth Circuit's standard for admitting expert testimony. No. 1:14CV383-HSO-JCG, 2016 WL 7670061, at *3–4 (S.D. Miss. Sept. 21, 2016), *aff'd*, 898 F.3d 607 (5th Cir. 2018). "District courts are to make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " *Id.* (quoting *Carlson v.*

*Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016)). "In short, expert testimony is admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). "The party seeking to have the district court admit expert testimony [here, the Plaintiffs] bears the burden of proof [on these issues]" *Williams*, 2016 WL 7670061, at *3.

To satisfy the reliability prong, Plaintiffs must show that Dr. Goldstein's opinions are "grounded in the methods and procedures of science and . . . more than unsupported speculation or subjective belief." *Williams*, 2016 WL 7670061, at *3 (quoting *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (per curiam)). To do this, Plaintiffs must show "(1) [Dr. Goldstein's] testimony is based upon sufficient facts or data, (2) [it] is the product of reliable principles and methods, and (3) [Dr. Goldstein] has applied the principles and methods reliably to the facts of the case." *Id.* (citations, quotation marks, and internal alterations omitted). If there is an inadequate "fit between the data and the opinion proffered" by Dr. Goldstein, then his opinions are inadmissible. *Brown v. Ill. Cent. R. Co.*, 705 F.3d 531, 535 (5th Cir. 2013) (quotation omitted); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of [Dr. Goldstein]." *Id.*

Even if Dr. Goldstein's opinions were somehow reliable, Plaintiffs would still have to show that his opinions would assist the trier of fact. As this Court explained in *Williams*, "[t]he expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Williams*, 2016 WL 7670061, at *3 (quoting

*Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015)). Here, even granting Dr. Goldstein every benefit of every doubt his testimony does not assist the trier of fact in its primary mission on causation—deciding whether or not a particular Plaintiff's symptoms were caused by mold. By his own admission, his opinions stop far short of this minimum threshold. For all of these reasons, Dr. Goldstein's opinions must be excluded.

## ARGUMENT

**I.  Dr. Goldstein has not opined (and cannot opine) that mold caused any particular Plaintiff's medical symptoms.**

In any toxic-tort case, a plaintiff must show both general and specific causation. These are distinct concepts. "General causation means that a substance is capable of causing a particular injury; specific causation looks to whether the substance caused the specific plaintiff's injury." *Shed v. Johnny Coleman Builders, Inc.*, No. 17-60640, __ F. App'x __, 2019 WL 994032, at *2 (5th Cir. Feb. 28, 2019) (affirming judgment for defense in mold case); *see Hooks v. Nationwide Hous. Sys., LLC*, No. CV 15-729, 2016 WL 3667134, at *11 (E.D. La. July 11, 2016) ("in a toxic mold case, a plaintiff must prove, given that the mold in question is capable of causing harm of the type suffered, that the specific type of mold found more likely than not caused the plaintiff's injuries in this particular case").

Dr. Goldstein's report and deposition testimony show that he did not attempt to form an opinion on specific causation. Dr. Goldstein "didn't make personalized decisions on a plaintiff-by-plaintiff basis as to who was exposed to what and whether that caused a particular symptom." Ex. 2 at 242:12–16. In fact, Dr. Goldstein did not even analyze individual plaintiffs; instead, he lumped all symptoms experienced by everyone in a particular household together—which he

265900.2

erroneously referred to as a "cohort."[2] During his deposition, Dr. Goldstein repeatedly refused to discuss individual plaintiffs because he "didn't take that approach."[3]   Even though Dr. Goldstein's report states the residents in Plaintiffs' household "suffered from" exposure to mold, Dr. Goldstein never says that a particular symptom in a particular Plaintiff was caused by a particular mold. Ex. 3 at 329:23–330:2.

Thus, his opinion is not relevant to the issue of specific causation. *See Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 809 (5th Cir. 2018) (expert's opinion would not "help the trier of fact" because he "only conclude[d] that his theory is as likely as the defense theory"); *Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 587 (5th Cir. 2004) ("Since [the expert] cannot show that the welding electrodes are more or less probable to be the cause of [the plaintiff's] cancers, the testimony is irrelevant under the Federal Rules of Evidence."); *Pipitone*, 288 F.3d at 245 ("A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."); *Williams*, 2016 WL 7670061, at *53 (excluding expert opinion because it would not "assist the trier of fact [in] understand[ing] the evidence in this particular case or to determine a fact in issue"). Because Dr. Goldstein's

---

[2] Ex. 2 at 151:16–23 ("So what you're saying is, is that you cannot tell us which of the [individuals in a particular household] was diagnosed with allergic rhinitis, for example; correct? A: As I stated, I have looked at this as a cohort, and not individuals. Q: All right. And that applies generally across all of these reports; correct? A: That's correct."); *id.* at 218:24–25 ("I didn't break the standard to individuals, and I won't do that."); *id.* at 219:3–4 ("So you're going to individuals and I'm not going to comment on individuals. I'm going to comment on the cohort.").

[3] Ex. 2 at 241:25–242:4 ("Q: So you're—it wasn't your job, as you viewed it, to make a specific finding with respect to a specific plaintiff that Plaintiff A's symptom, fill in the blank, was caused by exposure to mold, fill in the blank; true? A: I didn't take that approach."); see id. at 241:3–7 ("Q: So can you identify for any particular plaintiff . . . that a particular symptom—that exposure to a particular mold caused a particular personal injury? A: Well, I'm not going to do that . . . ."); *id.* at 226:1–4 ("Q: Are you testifying that if Makayla Foster was diagnosed with rhinitic—allergic rhinitis— A: So here we go back to an individual which I'm not going to discuss. I'm going to discuss the cohort."); Ex. 3 at 277:7–17; *id.* at 302:2–15.

opinions fall far short of the required evidence necessary to establish specific causation and thus would not be helpful to the trier of fact, they must be excluded.

**A. To the extent Plaintiffs offer Dr. Goldstein as an expert on specific causation, his opinion is unreliable.**

While Dr. Goldstein's deposition testimony shows that he is not opining on specific causation, Defendants expect that the Plaintiffs will attempt to avoid outright dismissal of their case, and offer him for that purpose. If so, this Court should reject Dr. Goldstein's opinions as unreliable for several reasons.

(1)      Dr. Goldstein's methodology relies solely on temporal correlation;

(2)      He did not rule out (or even investigate) other potential causes;

(3)      He has not identified the level of exposure likely to cause harm; and

(4)      He connects Plaintiffs' symptoms to mold only through *ipse dixit*, not science.

***(1) Dr. Goldstein's methodology relies solely on temporal correlation.*** Dr. Goldstein's methodology can be summed up this way: (1) he obtained the symptoms compiled by Plaintiffs' lawyers, (2) he reviewed their medical records to ensure that at least one of the members of the Plaintiff family group experienced that symptom, and (3) he considered whether the list of symptoms *could have been caused* by mold.[4] His expert report concludes that "The occurrence of some, if not all, of [the Plaintiffs'] symptoms are ***positively correlated*** with toxic exposure to the following pathogens . . . ." Ex. 4 (Goldstein Report) at 3 (emphasis added). This statement does nothing to show that mold actually caused any particular Plaintiff's symptoms. It is merely

---

[4] Ex. 2 at 106:2–107:7 (confirming that he obtained his list of symptoms from the pre-discovery disclosures and then confirmed them upon reviewing the medical records); *id.* at 151:24–152:2 ("Q: So you listed all of the symptoms complained of by all of the plaintiffs in that family group, and they're listed here; right? A: That's correct. Q: So it doesn't mean that each plaintiff suffered from each symptom; right? A: That's correct. Q: And sitting here today, you can't identify which symptom is identified with which plaintiff; correct? A: I didn't take that approach.").

a statement of theoretical correlation, but courts have universally recognized that "correlation is not causation." *See Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009); *Anderson v. Bristol Myers Squibb Co.*, No. CIV.A. H-95-0003, 1998 WL 35178199, at *4 (S.D. Tex. Apr. 20, 1998) ("courts have repeatedly emphasized that an expert's testimony as to evidence which 'suggests' a correlation is insufficient to scientifically support a *causal* connection")

But temporal correlation is all that Dr. Goldstein has. As he explained, his "analysis relies first on the medical diagnosis of the symptom during the time that [Plaintiffs] lived at Keesler." Ex. 2 at 218:17–19. When asked if he was "saying that [a particular plaintiff's symptom] was caused by mold because there was mold in the house," Dr. Goldstein responded: "the point is, is that a person can have a symptom prior, and once they get in the house and once they're exposed, they **can** exacerbate an existing . . . condition." Ex. 2 at 220:2–17 (emphasis added). Dr. Goldstein explained that "they were exposed to these molds, and they had symptoms. That's a fact"; "there's a correlation between the mold and the symptoms"; and "that's all we know." Ex. 3 at 337:5–14.

Federal courts, including the Fifth Circuit, have routinely excluded expert opinions based on temporal correlation. *See Huss*, 571 F.3d at 459 ; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005); *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 276 (E.D. La. 2014) ("[C]ourts must not allow evidence of temporal correlation to serve as a substitute for science-based causation evidence.") (quoting *Huss*, 571 F.3d at 459). In *Huss*, the Fifth Circuit explained the problem with causation opinions based on temporal proximity:

> [S]imply because a person takes drugs and then suffers an injury does not show causation. Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy. The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means "after this, because of this." Black's Law Dictionary 1186 (7th ed. 1999). It is called a

fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.

*Huss*, 571 F.3d at 459 (quoting *McClain*, 401 F.3d at 1243). The reasoning of the *Huss* court applies to this case as well. Dr. Goldstein merely assumes Plaintiffs' symptoms were caused by mold because mold was allegedly found in their homes. That is not a reliable methodology, and, accordingly, Dr. Goldstein's opinions should be excluded. *See, e.g.*, *Burleson*, 393 F.3d at 587 (expert testimony irrelevant when it did not make it "more or less probable" that chemical caused plaintiff's cancer); *Shed*, 2019 WL 994032, at *2  (records showing that plaintiff's symptoms were merely "*consistent* with mold exposure" did not establish specific causation); *Hooks*, 2016 WL 3667134, at *10 (expert's opinion that mold caused certain medical symptoms was unreliable because it was based on temporal relationship).

     *(2) Dr. Goldstein failed to exclude other potential causes.* In the Fifth Circuit, an expert generally must "rule out" other potential causes before he can opine on specific causation. *E.g.*, *Shed v. Johnny Coleman Builders, Inc.*, No. 3:16CV171-NBB-RP, 2017 WL 3624240, at *2 (N.D. Miss. Aug. 23, 2017), *aff'd*, __ F. App'x __,  2019 WL 994032 (5th Cir. Feb. 28, 2019) (explaining, in case alleging toxic mold, "the reliability of a specific causation opinion requires the proffered expert to consider and rule out other likely causes of the plaintiff's alleged ailments—in other words, the expert must perform, and the plaintiff must present to the court, a proper differential diagnosis") (citation omitted); *see McNabney v. Lab. Corp. of Am.*, 153 F. App'x 293, 295 (5th Cir. 2005) (expert's "failure to consider and exclude other potential causes of [plaintiff's] injury before offering an opinion render[ed] his testimony unreliable"); *Jenkins v. Slidella L.L.C.*, No. CIV.A.05-370, 2008 WL 2649510, at *4 (E.D. La. June 27, 2008), *aff'd*, 318 F. App'x 270 (5th Cir. 2009) ("it is also well settled that the reliability of a medical causation opinion requires the proffered expert to rule out other likely causes") (citation omitted); *In re*

9

*Propulsid Prod. Liab. Litig.*, 261 F. Supp. 2d 603, 618 (E.D. La. 2003) (expert testimony excluded, in part, because expert did not "rule out other explanations"); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 683 (W.D. Tex. 3002) ("Another step in establishing specific causation is for the expert to demonstrate that the product was more likely to have caused a plaintiff's injuries than any other potential cause."). Dr. Goldstein did not perform a differential diagnosis,[5] the generally accepted method for establishing specific causation. *See Shed*, 2017 WL 3624240, at *2.

Once again, Dr. Goldstein's opinions fail to meet minimum standards. Dr. Goldstein agreed that "mold is ***one potential*** cause among ***many***" for the symptoms the [Plaintiffs] experienced and that he is ***not*** saying "that it's mold as opposed to any of the others." Ex. 2 at 247:15–18. Instead, his opinion is that "mold has to be considered as ***one*** of the causes." *Id.* at 247:19–20. To illustrate, Dr. Goldstein was asked how he concluded that a Plaintiff's allergic rhinitis was caused by mold as opposed to some other cause. Dr. Goldstein responded:

> "Oh, I didn't say as opposed to those others, did I? You're saying that. . . . I'm just saying that mold was present in the home and ***could be***, obviously, a contributor and—to that. ***I never said there were no other contributors***. You just said that."

Ex. 2 at 225:11–18 (emphases added). By his own admission then, Dr. Goldstein testified that he did nothing to rule out other potential environmental factors.

- "Q: And what did you do, sir, to rule out those other environmental factors? A: I didn't rule them out. I included them. . . . I didn't exclude them." Ex. 3 at 306:12.

- "I'm not negating exposure to other symptoms—to other environmental factors. I'm just saying that one of those . . . was the identification of these molds.". Ex. 2 at 226:18–19.

---

[5] Ex. 2 at 26:2–4 ("Q: And you cannot and do not do a differential diagnosis; right? A: That's correct.").

- "mold is a possible cause, and ***there may be other environmental factors that could have contributed*** as well." Ex. 2 at 228:1–3 (emphasis added).

Other courts have rejected this exact same logic as scientifically unreliable. *See Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 882 (W.D. Tex. 2997) (excluding expert's opinion regarding cause of plaintiff's symptoms because "[e]ssentially, this is a bit like saying that if a person has a scratchy throat, runny nose, and a nasty cough, that person has a cold; if, on the other hand, that person has a scratchy throat, runny nose, nasty cough, and wears a watch, they have a watch-induced cold"); *In re Agent Orange Prod. Liab. Litig.,* 611 F. Supp. 1223, 1237–38 (E.D.N.Y.1984) (rejecting testimony that, if person exposed to Agent Orange had disease, that disease was caused by Agent Orange, but if person had disease with no exposure to Agent Orange, that person had naturally occurring condition). Because Dr. Goldstein failed to rule out other potential causes of any particular individual's medical symptoms, he cannot reliably say that any particular symptom was caused by mold. For this separate and independent reason, he cannot offer an opinion on specific causation.

***(3) Dr. Goldstein does not know the level of exposure that is harmful.*** As noted above, Dr. Goldstein does not know the level of mold exposure that is harmful for humans. This is important because establishing specific causation requires Dr. Goldstein to show that an individual Plaintiff was, in fact, exposed to harmful levels of mold. In the Fifth Circuit, "[s]cientific knowledge of the harmful level of exposure to a chemical, ***plus knowledge that the plaintiff was exposed to such quantities***, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."[6] *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) (emphasis added); *Hooks*, 2016 WL 3667134, at *11 (finding expert's opinion was unreliable

---

[6] Note that Dr. Goldstein disagrees with the Fifth Circuit on this point. Ex. 2 at 63:12 ("Q: In your view, you can sustain a burden in a toxic tort case without knowing the harmful level to a chemical or how much they were exposed to? A: Absolutely, especially if it's a carcinogen.").

because, "[a]ssuming that some unsafe level of mold existed, [he] is unable to prove that the mold in the home rose to that level and caused Plaintiffs injuries"); *Pretus v. Diamond Offshore Mgmt. Co.*, 2010 WL 11552857, at *6 (E.D. Tex. Sept. 14, 2010) (same).

In this case, Dr. Goldstein has testified that the level of harmful exposure varies for each individual Plaintiff.[7] Despite this testimony, Dr. Goldstein is adamant that he never analyzed any Plaintiff individually—only the family "cohort." By his own admission then, Dr. Goldstein cannot testify that any particular Plaintiff experienced a harmful level of exposure. *See Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 836 (W.D. Tex. 3005) (opinion unreliable because expert failed to follow his own methodology).

Even if Dr. Goldstein had determined the harmful level of exposure for each individual Plaintiff, he admits that he ***does not know what level*** of mold exposure each Plaintiff experienced. Ex. 3 at 318:21–23 ("Q: But as to the level of exposure at any . . . time [other than the day a mold test was conducted], we don't know; correct? A: That's true."). He also admits that "there [is not] any evidence—medical evidence, physical evidence, or whatever kind of evidence . . . that a mycotoxin existed in any of these plaintiffs." Ex. 2 at 165:5–12. In his own words, "We don't have the data for that." *Id.*

Perhaps realizing that he could not establish the level of any particular Plaintiff's exposure, Dr. Goldstein discounted this factor entirely, saying that it "has no meaning at all." Ex. 2 at 178:14–17. There is no need to determine the harmful level of exposure, he claims, because "any exposure" is unreasonable:

Q:      . . . Is any mold an unreasonable risk of exposure?

---

[7] Ex. 2 at 142:9–143:1 (explaining that "we don't know precisely what that harmful level is" and that "scientific literature is difficult to come by to establish a specific harmful level [so] [y]ou have to establish it for that individual").

A:      If you can see it and you can smell it, you've been exposed, and that is
         unreasonable.

Ex. 2 at 25:18–22. Dr. Goldstein has not identified any scientific studies or literature supporting

his argument that "any exposure" is too much, and those opinions fly in the face of every

published guidance and study demonstrating that mold is ubiquitous.[8] If, in fact, "any exposure"

to mold was "too much," then everyone on Earth would be sick all the time.

The Fifth Circuit considered a similar claim in *Moore v. Ashland Chemical, Inc.* 151 F.3d

269 (5th Cir. 1998) (en banc). After observing the expert "could cite no scientific support for his

conclusion that exposure to any irritant at unknown levels triggers [a particular medical

symptom]," it affirmed the exclusion of the expert's testimony, saying "[u]nder

the *Daubert* regime, trial courts are encouraged to exclude such speculative testimony as lacking

any scientific validity." *Moore*, 151 F.3d at 279. The same is true here, and this Court should

exclude Dr. Goldstein's opinions as unreliable.

*(4) Dr. Goldstein's methodology relies on mere* **ipse dixit** *rather than science*. It is well

established that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district

court to admit opinion evidence that is connected to existing data only by the ipse dixit of the

expert." *Joiner*, 522 U.S. at 146. In this case, Dr. Goldstein's opinion is classic *ipse dixit*. He is

effectively asking the Court to "take my word for it" on several important points.

Dr. Goldstein testified that "any exposure" to mold is sufficient to cause Plaintiffs'

medical symptoms, even when the only test results we have show that there was more mold

**outside** the Plaintiff's home than **inside**. Ex. 2 at 25:18–22; *id.* at 233:15–17 ("It would be naive

to think that [exposure outside the home] was more important or less important than [exposure

---

[8] "There is always some mold everywhere—in the air and on many surfaces."
https://www.cdc.gov/mold/dampness_facts.htm. "Molds are part of the natural environment, and can be
found everywhere, indoors and outdoors." https://www.epa.gov/mold.

inside the home].")[9] Several federal courts in the Fifth Circuit have considered this argument and rejected it as unreliable. For example, the court in *Comardelle v. Pennsylvania General Insurance Co.* labeled this approach the "every exposure" theory and held that "it is precisely the kind of testimony the Supreme Court in *General Electric Co. v. Joiner* observed as being nothing more than the ipse dixit of the expert." 76 F. Supp. 3d 628, 634 (E.D. La. 2015) (internal alterations, quotation marks, & citations omitted). The court explained,

> [a]lthough there may be no known safe level of asbestos exposure, this does not support [the expert's] leap to the conclusion that therefore every exposure [the plaintiff] had to asbestos must have been a substantial contributing cause of his mesothelioma. . . . ***This kind of blanket specific causation opinion is not based on or tied to the specific facts and circumstances*** of any of [the plaintiff's] exposures to asbestos and it elides any differences or nuances of duration, concentration, exposure, and the properties of the fibers to which he may have been exposed. ***The Court is not persuaded that such a one-size-fits-all approach is reliable expert testimony.***

*Id.* (emphasis added & footnotes omitted).

Similarly, when confronted with contrary facts—such as pre-existing symptoms or tests indicating that mold concentrations were higher outside the home than inside—Dr. Goldstein consistently responded "I considered that," without explaining his "consideration."[10] This too is

---

[9] Ex. 2 at 234:13–19 ("Q: Dr. Goldstein, if someone's exposed to mold, the same kind of mold outside that they are inside, how can you say, to a reasonable degree of scientific certainty, that a symptom that they got from mold was caused inside as opposed to outside? A: Because they're exposed inside, and that's the main point.").

[10] Ex. 3 at 313:11–16 ("Q: So based on these results, if someone had an exposure to Cladosporium outside the house, you have no basis and did not do any work to determine or rule out that exposure outside the house; correct? A: ***I absolutely considered that***, but I also considered that they're exposed inside the house."); *id.* at 461:13–25 ("Q: [A particular plaintiff] had, as of March 24th, 2006, had reported a life history of seasonal allergies—and, again, his medical records August 18th, 2011, he reported a history of lifetime allergic rhinitis, that was negative for molds. Again, did you consider those in rendering your opinions? A: ***Yes, I considered them.*** Q: Yeah. And you discount the allergy testing because you don't feel like it was validated? A: I don't discount it. I'm waiting for validation in order to use it as a true factor . . . ."); *id.* at 229:9–15 ("Q: Did you—did you consider whether any of the plaintiffs—whether any of the Fosters were allergic to mold or a particular type of mold, in your analysis? A: Yes. Q: Were any of them? A: Again, I don't have—***I considered it***, but I don't have testing that has been validated.") (all emphasis added).

classic *ipse dixit*. Dr. Goldstein has not explained how he ruled out these contrary facts as the cause of a particular Plaintiff's symptoms. Courts in the Fifth Circuit have excluded such conclusory opinions because there is too great an analytical gap between the facts and the expert's conclusion. *Smith v. Chrysler Group, L.L.C.*, 909 F.3d 744, 749 (5th Cir. 2018) (affirming exclusion of conclusory opinion because expert "[did] not explain his methodology for reaching his conclusion, leaving the district court to guess at how" it was formed); *Weiser-Brown Operating Co.*, 801 F.3d at 529 (affirming exclusion because expert's "untestable, conclusory statement would not assist the jury"); *Previto v. Ryobi N. Am., Inc.*, 766 F. Supp. 2d 759, 772 (S.D. Miss. 2010) (excluding expert's opinion because there was "too great an analytical gap" when the expert did not "identify any sources for the information underlying [the] particular opinion" and "the methodology for reaching [his] conclusion [has not] been adequately described"); *West v. Drury Co.*, 2009 WL 1587344, at *5 (N.D. Miss. June 5, 2009) (excluding expert opinion because expert "offer[ed] no guide as to where his conclusions came from or how one might judge the value of those conclusions" which meant the expert could get on "the stand and make any assertion he chooses without regard for the truth"). This Court should likewise exclude Dr. Goldstein's opinions.

**B. Dr. Goldstein's purported methodology—the Bradford-Hill criteria—cannot be used to establish specific causation.**

Dr. Goldstein claims that he applied the Bradford-Hill criteria to determine causation in this case. In *Pounds v. Rogersol, Inc.*, Judge Barbour summarized this methodology as follows:

> The "Bradford Hill criteria is a method for determining whether the results of an epidemiological study can be said to demonstrate causation and not a method for testing an unproven hypothesis." *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 678 (M.D.N.C. 2003). "***The first step in the causation analysis pursuant to Bradford Hill is an epidemiological stud***y that has identified an association between two variables. ***Once a study has shown that there is an association***, the next step is to determine whether the 'association identified in an epidemiologic study may or not be causal.' " *Id.* at 679 (citations omitted). Causality in this

context is determined by considering the following **nine factors**: (1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of the findings; (5) biological plausibility (coherence with existing knowledge); (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge. *See e.g.*, *In re Neurontin Mktg., Sales Practices, and Prods. Liab.*, 612 F. Supp. 2d 116, 132-133 (D. Mass. 2009)(explaining that the "Bradford Hill criteria are nine factors which researchers often consider when judging whether an observed association is truly causal.").

*Pounds v. Rogersol, Inc.*, No. 3:07-CV-554-WHB-LRA, 2010 WL 11527412, at *4 (S.D. Miss. June 15, 2010) (emphasis added).

While some federal courts have said the Bradford-Hill criteria **can** be a reliable methodology for establishing **general** causation, courts have also held the Bradford-Hill criteria **cannot** be used to establish **specific** causation. *See, e.g.*, *Jones v. Novartis Pharm. Corp.*, 235 F. Supp. 3d 1244, 1274 (N.D. Ala. 2017) ("Numerous courts have referred to the Bradford Hill criteria as a useful tool to analyze general, rather than specific, causation."); *In re Viagra Prod. Liab. Litig.*, 658 F. Supp. 2d 950, 958 (D. Minn. 2009) ("[T]he Bradford Hill criteria are used to establish general causation from epidemiological studies—***they are not used to establish specific causation***.") (citing *Wells v. SmithKline Beecham Corp.,* No. A--06--CA--126--LY, 2009 WL 564303, at *11 (W.D. Tex. Feb. 18, 2009)) (emphasis added).

But, even if the Bradford-Hill criteria somehow could be used to establish specific causation, Dr. Goldstein's application of the Bradford-Hill criteria to the facts of this case would be unreliable. The "first step" in the Bradford-Hill analysis is "an epidemiological study that has identified an association between two variables." *Pounds*, 2010 WL 11527412, at *4; *Frischhertz v. SmithKline Beecham Corp.*, 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012) (excluding Dr. Goldstein's opinion because he "attempted to use the Bradford-Hill criteria to prove causation without first identifying a valid statistically significant association. [Instead,] [h]e first developed a hypothesis and then attempted to use the Bradford-Hill criteria to prove

16

265900.2

it.").[11] Dr. Goldstein did not identify any epidemiological studies in his expert report. Second, even if he had identified studies, Dr. Goldstein did not analyze any particular medical symptom claimed by a specific individual but, instead, lumped all the symptoms experienced by all persons living in a particular household together. Third, Dr. Goldstein admits he did not apply several of the Bradford-Hill criteria, such as the strength of association or the dose-response relationship.[12] Further, Dr. Goldstein has never explained how he applied the Bradford-Hill criterion "consideration of alternative explanations" (or even that he did apply it). Instead, he baldly asserts that he "considered" everything in the medical records, without details.[13]

Thus, even if the Bradford-Hill criteria were a valid methodology for determining specific causation, Dr. Goldstein is still unable to offer a reliable opinion on specific causation. For this reason, among others, the *Frischhertz* court likewise reached the conclusion that Dr. Goldstein's specific-causation opinions based on the Bradford-Hill criteria are simply unreliable. *Frischhertz*, 2012 WL 6697124, at *6 (because Dr. Goldstein had not "first identif[ied] a valid

---

[11] Dr. Goldstein apparently disagrees with the *Frischhertz* court (and apparently all the other courts that have said a "valid statistically significant association" is a necessary first step to using the Bradford Hill criteria), but he could not point to anything to support his position. Ex. 2 at 70:6–25 ("Q: And you believe that you can establish causation using the Bradford Hill criteria without a statistically significant association first? A: Yes. The statistics are greater than 50 percent. That's the—that's the accepted amount. Q: Well, the point is that what the judge is stating is the requirement is that there must be an association, a statistically significant one, between a toxic element and an adverse reaction before you apply the Bradford Hill. Do you agree with that? A: No. Q: Is there any support for that position, that you may apply Bradford Hill without that statistically significant association? A: There's actually no support for that position that you can—that you must. Q: All right. Well, what would I—where would I go, what would I read to figure out how the judge got it wrong? A: I don't know.").

[12] Ex. 2 at 203:8–204:18 (claiming he did not apply "strength of association"—which measures the magnitude of the increased risk that a particular substance will cause a particular condition—because he did not have enough data); *id.* at 204:19–205:13 (claiming he did not apply "consistency of association"—which measures whether the association happens consistently—because he did not have any data); *id.* at 205:13–207:03 (claiming he did not apply the "dose-response relationship" because "obviously in this particular case, we can't possibly have a dose-response curve because we have one set of data, and how do you—you can't do that in a residential home with people who are exposed unless you tear apart the house and you get all the data, and you can't do that. You would destroy their home.").

[13] See n.12, above.

17

statistically significant association," the Court concluded he "inappropriately applied the Bradford-Hill criteria."). Defiant to the end, when confronted with the requirement of a statistically significant association and his failure to provide such in either in the *Frischhertz* case or this case, Dr. Goldstein responded merely "That's what [the court said], and they're wrong." Ex. 2 at 76:5–8. When asked whether he disagreed with the federal courts which required a statistically valid association before applying Bradford-Hill criteria, Dr. Goldstein testified "It's absolutely ridiculous." Ex. 2 at 196:12-16.

## II.   Dr. Goldstein's opinion that mold is capable of causing the Plaintiffs' symptoms is similarly unreliable.

In the typical causation analysis under *Daubert*, general causation precedes specific causation. This Motion addresses specific causation first because Dr. Goldstein admits he is not offering an opinion on specific causation, and any hope of a reliable opinion on specific causation was dashed by Dr. Goldstein's unreliable methodology. Once this Court determines that Dr. Goldstein cannot testify regarding specific causation, Plaintiffs' claims will fail as a matter of law. *See Shed*, 2019 WL 994032, at *2. For that reason, the Court need not reach any questions regarding the reliability of Dr. Goldstein's general-causation theories, which nonetheless cannot assist the trier of fact. That is so for at least two reasons. First, Dr. Goldstein's report does not provide any reference to any scientific or medical basis for his claims of general causation. Second, Dr. Goldstein introduces a general-causation theory based on the purported presence of mycotoxins in Plaintiffs' home without any scientific or medical basis, and without a shred of physical evidence.

### A.   Dr. Goldstein failed to support his opinion with scientific literature or published studies.

Federal Rule of Civil Procedure 26(a) requires an expert to include "a complete statement of all opinions the witness will express and the basis and reasons for them" as well as "the facts

or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). The "report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *Beane v. Util. Trailer Mfg. Co.*, 934 F. Supp. 2d 871, 877 (W.D. La. 2013) (quoting *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010)). In other words, a "report[] must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Id.* (quoting *R.C. Olmstead*, 606 F.3d at 271).

In the *Pounds* case already cited above, Judge Barbour found an expert's opinion on general causation inadmissible, noting that the Fifth Circuit has "frowned on causative conclusions bereft of statistically significant epidemiological support." *Pounds*, 2010 WL 11527412, at *5 (quoting *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380 (5th Cir. 2010)). In the absence of any study showing an epidemiological link between the toxin and the alleged injury, the court found the expert's opinion was unreliable.

Dr. Goldstein's initial report failed to meet this basic disclosure requirement because he failed to identify ***any*** studies he purportedly relied upon in forming his opinions. In fact, the complete list of studies cited in Dr. Goldstein's initial report is below:

> Literature Cited
> Bradford-Hill, A. Proc. Royal Soc. Med. 9, 295, 1965
> Friedman, D. 2000 Sir Bradford-Hill: Criteria for Causation
> Hope, J., Hope, B. 2012 J. Environ. Pub. Health, Article ID 835059

Ex. 4 at 6.[14]  But at his deposition, Dr. Goldstein repeatedly testified that he relied on other scientific studies that were not cited in his report.[15]  While Dr. Goldstein has attempted to cure

---

[14] The first two references relate to the Bradford-Hill criteria, the methodology allegedly employed by Dr. Goldstein, and do not provide any scientific or medical support for Dr. Goldstein's

these deficiencies through a supplemental report (*after* the designation deadline, *after* Defendants' experts had been designated and disclosed, and *after* his deposition), that report must be stricken for the reasons set forth in Defendants' separate motion on that subject. In his original report and the one to which he must be held accountable, Dr. Goldstein confirmed that there were no studies, reports, or scientific basis cited in his report which demonstrated a correlation between abdominal pain and mold exposure,[16] between headaches and mold exposure,[17] or between vomiting and mold exposure[18]—to name a few. In fact, Dr. Goldstein does not cite a single epidemiological study, medical article, or authoritative source to support any of his opinions relating to general causation.

This pattern of behavior is not new for Dr. Goldstein. In *Mause v. Global Household Brands, Inc.*, No. 01-4313 2003 WL 22416000 (E.D. Pa. Oct. 20, 2003), Dr. Goldstein's

---

substantive opinions. The final article deals with Ochratoxin A, a mycotoxin which can be produced from certain molds, and the exposure to food contaminated with that mycotoxin. Ex. 2 at 128:9–128:16). There is no allegation or proof in this case regarding foodborne contamination, or any proof or evidence that there was any exposure of these plaintiffs to Ochratoxin.

[15] Ex. 2 at 77:11–18 ("Q: But there's no studies showing the correlation between those things; is that true? A: No, that's not true. Q: Oh, there are? A: Yes. Q: All right. Are they in your report? A: ***Are they in my report? I don't know.*** When we get to it, we'll find out.") (emphasis added); *id.* at 125:10–13 ("Q: . . . Can you tell me what those scientific studies are that you are relying on, sitting today? A: Well, sitting here, I don't have exact citations, but I can provide them to you."); *id.* at 165:13–25 ("Q: Can you——or are there epidemiological studies that support an association between mold exposure and each one of these symptoms listed in the Foster report? A: I don't know offhand. Q: Well, for example, are there scientific studies that link—that show a correlation or association between chronic abdominal pain and mold exposure? A: These—this information I got, I got out of scientific papers, yes. Q: What's the—what's the paper that provides that? A: ***Oh, that's a good question. I can provide that to you.***") (emphasis added); id. at 166:18–21 ("Q: Sir, did you cite any study showing an association between headaches and exposure to mold? A: In this report? Q: Yes, sir. A: No."); *id.* at 167:4–12 ("Q: Did you cite such a report in your report? A: I mention mycotoxins. It's listed under—it's in that. Q: Did you cite a study showing a correlation between the two? A: No, but I can provide that to you. And I, in fact, mentioned that in my report. In the very end, I say: 'I retain my right to change my opinions as I receive new information.' "); *id.* at 182:25–184:15.. Obviously, the right to change one's opinions as one receives new information is not meant to entitle an expert to do his research only after he is deposed.

[16] Ex. 2 at 165:17–166:4.

[17] Ex. 2 at 166:18–166:22.

[18] Ex. 2 at 166:24–167:170.

265900.2

opinions were excluded because he "cites to no specific articles, textbooks, or studies to support his conclusion, nor does he set forth his scientific methodology." *Id.* at *2. Accordingly, his opinions were "no more than a subjective belief or unsupported speculation." *Id.* (internal quotation marks & citation omitted). Without citations, Dr. Goldstein's report is nothing more than unsupported, "conclusory statements." Dr. Goldstein's opinion as to general causation is, therefore, unreliable. *See Wells*, 601 F.3d at 380; *Pounds*, 2010 WL 11527412, at *5. This Court should follow suit and exclude all of Dr. Goldstein's general-causation opinions.

### B. Dr. Goldstein's general-causation theories regarding mycotoxins are unreliable.

According to Dr. Goldstein, general causation in this case is twofold: "you have to consider possible allergies [to mold] and you have to consider the fact that you have mycotoxins." Ex. 3 at 372:17–372:18. Dr. Goldstein wisely refused to testify as to whether any of the Plaintiffs' medical symptoms were caused by an allergic response to mold, which Dr. Goldstein correctly left with Plaintiffs' treating physicians and others qualified to render those opinions.[19] For Dr. Goldstein, that leaves mycotoxins. Generally speaking, mycotoxins are toxic substances which can be produced by particular species of molds under certain circumstances.[20] Dr. Goldstein's report ***does not*** state that mycotoxins can cause any of the symptoms for which Plaintiffs complain. Instead, his report simply concludes that "[i]ndividual exposed to Aspergillus and Penicillium in their homes are exposed to the mycotoxin Ochratoxin A (OTA)." Ex. 4 at 5. However, in his deposition, Dr. Goldstein made quite clear that he intends to testify that "all of these symptoms can be caused by exposure to mycotoxins which come from molds,"

---

[19] Ex. 3 at 373:1–373:6 ("Q: Okay. And so you're not here to testify which of these symptoms are relating to an allergic response? You don't have that expertise? A. I can show you the literature that identifies that in the scientific literature. For each individual person, you would have to go to the treating physician.")

[20] See https://www.cdc.gov/niosh/topics/indoorenv/whatismold.html.

Ex. 3 at 373:19-22 and that "exposure to molds and mycotoxins can exacerbate preexisting conditions." *Id.* at 416:1–2.

His completely unsupported opinions regarding mycotoxins in his deposition prompted Defendants to serve supplemental reports regarding Dr. Goldstein's report on mycotoxins. According to Dr. Allison Stock, who holds a Ph.D. in Toxicology and a Masters in Public Health and who served with the Centers for Disease Control handling CDC's responses to mold cases, the scientific literature does not support Dr. Goldstein's theory that all mycotoxins in any form and at any dose are detrimental to human health. Ex. 5 (Supplemental Report of Dr. Stock) at 6). Moreover, there is a large body of scientific literature which does ***not*** find an association between mold exposures and airborne mycotoxin exposures in buildings and facilities. Ex. 5 at 2. As he did with all of his general-causation theories, Dr. Goldstein admits that while he believes there is scientific and epidemiological support for this general-causation theory relating to mycotoxins, he did not cite any of that authority in his report. Ex. 3 at 418:11–14. Dr. Stock disagrees, and states that there is no human toxicological or epidemiological data linking the one mycotoxin Dr. Goldstein references, OTA, with adverse health effects. Ex. 5 at 7.[21] In short, Dr. Goldstein's general causation theory based on mycotoxins is classic "junk science" which must not darken the doors of a court of law. "Courts must be arbiters of truth, not junk science and guesswork." *Huss*, 571 F.3d at 460; *Hill ex rel. Hill v. Koppers, Inc.*, 2009 WL 4908836, at *2 (N.D. Miss. Dec. 11, 2009) ("Essentially, the court is the gate-keeper charged with determining

---

[21] Further, Dr. Goldstein's reliance on the Hope and Hope article was not valid or relevant, since (i) the Hope and Hope article dealt with animal studies, (ii) the only claimed human-health effect in that article was Balkan Endemic Nephropathy (BEN), (iii) BEN is a kidney-function disease purportedly associated with the ingestion of OTA and is not claimed by any Plaintiff in these cases, and (iv) there is no epidemiological literature establishing a relationship between OTA and adverse human health effects. Ex. 5 at 7-8.

whether the expert's testimony is reliable and relevant enough to not be junk science or mere paid-for opinions."

In his deposition, Dr. Goldstein readily conceded that there is not a single shred of proof that there were even any mycotoxins present in any Plaintiff's home. Dr. Goldstein confirmed

- not every genus of mold produces mycotoxins,

- only some species of the genus' allegedly present in Plaintiff's home produce mycotoxins (e.g., mold from the genus *Aspergillus* may or may not produce mycotoxins, while the genus and species *Aspergillus niger* can produce mycotoxins);

- different species create different mycotoxins;

- some species create no mycotoxins;

- to know whether the species present actually produces mycotoxins, you would need a culture from that species;

- there are no culture tests from any mold found at the Plaintiff's home;

- no one knows which species of any mold was present in any Plaintiff's home;

- there is no evidence that there were any mycotoxins present in any Plaintiff's home;

- there is no evidence that any mycotoxins were present in any Plaintiff's bloodstream or body; and

- There is no evidence of any exposure of any Plaintiff to any mycotoxin.

Ex. 3 at 126:7–128:2.[22]

---

[22] See also *id*. at 379:15–22 (no mycotoxins present in air in Plaintiff's home); *id*. at 379:3–10 (some species create specific mycotoxins, different species create different mycotoxins, and some species create no mycotoxins); *id*. at 419:4–13 (no evidence of which species present in Plaintiff's home or what mycotoxins, if any, were present); *id*. at 463:19–23 (no determination of what species existed in

Even if Dr. Goldstein's general-causation theory about mycotoxins could be supported by epidemiological evidence (and it cannot), there is no proof that mycotoxins were actually present, or that they were present in sufficient dose to cause adverse human-health effects. In *Allen v. Pennsylvania Engineering Corp.*, the Fifth Circuit explained that "[s]cientific ***knowledge of the harmful level of exposure to a chemical***, . . . [is a] minimal fact[] necessary to sustain the plaintiffs' burden in a toxic tort case." 102 F.3d at 199 (emphasis added) (finding expert's opinion unreliable because epidemiological studies expert relied on merely showed "correlation" between a chemical and brain cancer). *See also Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 727 (5th Cir. 2009) ("Without any facts that would establish the allegedly harmful level of exposure (or even some link to bladder cancer), . . . [the expert's] opinion regarding diesel exhaust does not establish general causation."). "In order for Plaintiffs to establish general causation, they bear the burden of proving, by a preponderance of the evidence, that they were exposed to a harmful level of mold." *Pratt v. Landings at Barksdale*, 2013 WL 5376021, at *4 (W.D. La. Sept. 24, 2013); *Hooks*, 2016 WL 3667134, at *8 (excluding opinion that could not identify threshold of harm posed by molds or actual exposure to toxic molds); *Pretus*, 2010 WL 11552857, at *6 (same).

Once again, Dr. Goldstein is up to his old tricks, already rejected by another court. In *Leija v. Penn Maritime, Inc.*, 2009 WL 211703 (E.D. La. Jan. 23, 2009), the plaintiff offered Dr. Goldstein to show exposure to certain chemicals caused his cancer. Dr. Goldstein opined "in medical and scientific probability" that the plaintiff "would not have developed cancer" if he

---

Plaintiff's home); *id.* at 380:5–16) (testing can be done to determine whether any Plaintiff had mycotoxins, and no such testing was done here); *id.* at 214:14–215:2 (no evidence that Plaintiff had a mycotoxin, of the species of mold found in Plaintiff's residence, of whether that species could produce mycotoxins, or of which mycotoxins were produced); *id.* at 165:5–10) ("Q: Is there any evidence— medical evidence, physical evidence, or whatever kind of evidence—that any—that a mycotoxin existed in any of these plaintiffs?  A: Good question. No."); *id.* at 382:23–383:2 (no data or testing showing exposure to any mycotoxin).

24

"had not worked around [those chemicals]." *Id.* at *2. The Court excluded his opinion because "Dr. Goldstein, who is not a medical doctor, is not qualified to render a medical opinion as to whether workplace exposure to toxic substances more likely than not caused Leija's cancer." *Id.* Further, "there [was] no evidence that Dr. Goldstein had any evidence of plaintiff's level of occupational exposure to [the chemical]." *Id.* When confronted with the Court's conclusions, Dr. Goldstein said that he knew better than the Court. Ex. 2 at 63:12 ("Q: In your view, you can sustain a burden in a toxic tort case without knowing the harmful level to a chemical or how much they were exposed to? A: Absolutely . . . .").

Dr. Goldstein has said, and will say, anything, whether grounded in reliable science or not. The only acceptable result is the complete exclusion of his opinions and testimony on all issues.

## CONCLUSION

For the reason stated above, Dr. Goldstein's opinions are unreliable and should be excluded in their entirety.

Respectfully submitted, this the 10th day of May 2019.

> *Attorneys for Hunt Southern Group, LLC fka Forest City Southern Group, LLC and Hunt MH Property Management, LLC*
>
> By its attorneys:
>
> */s/ Walter H. Boone*
> _____
> Walter H. Boone, MSB#8651
> Jennifer J. Skipper, MSB#100808
> **BALCH & BINGHAM LLP**
> 188 East Capitol Street, Suite 1400
> Jackson, MS 39201
> Telephone: (601) 961-9900
> Facsimile: (601) 961-4466
> E-mail: wboone@balch.com
> E-mail:  jskipper@balch.com

*Forest City Residential Management, LLC*

By its attorneys:

*/s/ Alison O' Neal McMinn*

Joshua J. Metcalf, MSB#100340
Alison O'Neal McMinn, MSB#101232
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201
Telephone: (601) 960-8600
Facsimile: (601) 960-8613
E-mail: Joshua.Metcalf@formanwatkins.com
E-mail: Alison.McMinn@formanwatkins.com

**-and-**

*/s/ William J. Hubbard*

William J. Hubbard (admitted *pro hac vice*)
Anthony Rospert (admitted *pro hac vice*)
THOMPSON HINE LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114-1291
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
E-mail: bill.hubbard@thompsonhine.com
E-mail: anthony.rospert@thompsonhine.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 10th day of May  2019 a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all known counsel of record by operation of the court' s electronic filing system.

*/s/ Walter H. Boone*

Walter H. Boone

265900.2